**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ENERGY MARKETING SERVICES, INC.,

                           Plaintiff,

v.                                    CIVIL  ACTION  NO. 2:04-0869

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

                           Defendants.

AGF, INC.,

                           Plaintiff,

v.                                    CIVIL  ACTION  NO. 2:04-0870

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

                           Defendants.

ADVANTAGE ENERGY MARKETING, INC.,

                           Plaintiff,

v.                                    CIVIL  ACTION  NO. 2:04-0871

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

                           Defendants.

1564 EAST LANCASTER AVENUE
BUSINESS TRUST,

               Plaintiff,

v.                                     CIVIL  ACTION  NO. 2:04-0872

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

               Defendants.

## MEMORANDUM ORDER AND OPINION

Pending before the Court are Defendants' Motions to Exclude Testimony of Dr. Harris (2:04-cv-869, doc.158; 2:04-cv-870, doc. 158; 2:04-cv-871, doc. 160; 2:04-cv-872, doc. 159).  For the following reasons, the Court **DENIES** these motions.

## I. PARTIES

These cases, once consolidated under *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 2:04-cv-867, now consist of four separate cases, each with a single plaintiff.  They are: Energy Marketing Services, Inc.; AGF, Inc.; Advantage Energy Marketing, Inc.; and 1564 East Lancaster Avenue Business Trust.  In each case, only three defendants remain, the "Columbia Defendants."  They are: Columbia Gas Transmission Corporation (TCO); Columbia Energy Services, Inc. (CES); and Base Petroleum, Inc. (Base).  These last two defendants are also known as the "Shipper Defendants."

## II. FACTS

On August 19, 2008, the Court denied Plaintiffs' renewed motion for class certification. In that order, the Court discussed the underlying facts of this case in considerable detail. Accordingly, the Court will not repeat those facts here. Rather, the Court adopts and refers to the factual summary as laid forth in the August 19 Order. Additional facts, as necessary, will appear in the discussion section of this opinion.

## III.  DR. HARRIS'S EXPERT REPORTS

Plaintiffs hired Dr. Michael Harris[1] to "provid[e] an opinion regarding when and to what extent the conduct of the Defendants impacted the volumetric business activity of the . . . Plaintiffs." *Report of Michael Harris, Ph.D.,* at p. 3. To accomplish this objective, Dr. Harris performed an analysis consisting of five tasks. He described these tasks as follows:

a) In the context of Plaintiffs' Breach of Contract Claim against Columbia Gas Transmission Corporation (TCO), calculate the volume of gas that was not allowed on or off the TCO system ("cuts") as a direct result of the illegal activity for each Plaintiff.

b) In the context of the antitrust claim against each of the Defendant Shippers, calculate the volumetric impact to each Plaintiff that was a direct result of the vertical conspiracy between the Defendant shipper and TCO.

c) Assess the harm to competition that resulted from each of the five vertical conspiracies.

d) In the context of the Plaintiffs' Unjust Enrichment Claim against each of the Defendants (TCO and the Shipper Defendants)[,] calculate the amount of unjust enrichment on a

---

[1]Dr. Harris is the president of Harris Economics Group (HEG), an economic consulting firm. He has been a consulting economist for nearly twenty years in a variety of industries and on a variety of issues. Dr. Harris also holds a Ph.D. in economics with specializations in industrial organization and applied microeconomics. Defendants have not challenged Dr. Harris's expert qualifications.

monthly basis for each Defendant and map, in a temporal sense, the occurrence of the monthly unjust enrichment to harm sustained by each Plaintiff.

e) Identify and address additional areas of harm sustained by each of the Plaintiffs that resulted from the illegal conduct of the Defendants.

*Id.* at p. 3-4. Each of these components of Dr. Harris's analysis are discussed in greater detail below.


**A.  Breach of Contract Claim**

Dr. Harris states that each Plaintiff lost profits due to TCO's illegal parks and loans.  He calculated lost profits by multiplying lost sales "by the net profit margin that would have been earned on each unit of gas . . . that was lost due to the illegal activity."  *Id.* at p. 5.  Potential sales were calculated by looking at Plaintiffs' "nominations," or requests to place gas on or take gas off TCO's system for later sale.

Lost sales are comprised of a direct component and an indirect component.  The direct component is "the volumetric quantity of gas that a Plaintiff actually requested be put either on or off the system but for which TCO said no and did so as a direct result of the illegal scheme."  *Id.* As pipeline shippers, Plaintiffs nominate, or request, a certain amount of gas to be placed on or off TCO's system on a daily basis.  These nominations are "then evaluated by TCO and based on priority rules established by TCO's tariff and the operational status of the pipeline, TCO determines how much, if any, of a shipper's nominations will actually be allowed to flow onto or off the system."  *Id.* at p. 5-6.  If TCO "cut," or declined to transport, some or all of the nominated gas due to the alleged scheme, these cuts were calculated as direct lost sales.

Dr. Harris states that illegal storage of the shipper Defendants' gas "forc[ed] TCO to restrict access to receipt points."  *Reply Report of Michael Harris, Ph.D.,* at p. 6.  In Dr. Harris's view, "the

causal link between the amount of gas parked on the system, the amount of gas in storage, and ability of TCO to accept receipt nominations is clear. . . . [A]bsent parked gas in storage, storage utilization would be less and TCO would not be restricting access to the system." *Id.* In other words, the illegal scheme caused TCO to refuse Plaintiffs' storage nominations, which in turn directly caused Plaintiffs' lost sales. Effectively the same idea holds true regarding Plaintiffs' borrowing nominations, with TCO lacking the gas to loan due to the illegal scheme.

Indirect lost sales "occur[] when a Plaintiff does not even nominate but would have but for the illegal activity." *Report of Michael Harris, Ph.D.,* at p. 6. Shippers are informed by TCO on a daily basis via an electronic bulletin board about the operational status of the pipeline, including whether TCO is accepting nominations for that day. Dr. Harris claims the scheme caused TCO to refuse to accept nominations on days when it otherwise would have accepted them, absent the scheme. On days when TCO was not accepting nominations, Plaintiffs had no reason to nominate, and thus sales lost due to these foregone nominations would not be captured in the direct losses discussed above. Therefore, indirect losses are used to "calculat[e] . . . the amount of nominations not submitted by the Plaintiffs but which would have been submitted by the Plaintiffs in the absence of the notices issued by TCO (and caused by the illegal activity)." *Id.* at p. 6.

Dr. Harris's report "focused on the direct component of a loss in volumetric sales that resulted from the illegal activity." *Id.* Direct losses due to cut receipt nominations were calculated according to a three-step process:

    1) For each day, sum the amount of gas illegally parked on the system and not yet un-parked;

    2) For that same day, calculate the amount of receipt nominations that were cut by TCO; and

    3) Define loss in direct volumetric sales as the lower of the amount calculated in (2) and (1).

*Id.* Dr. Harris explains that this final step "essentially ensures that the loss in sales can be no greater than the volume of illegally parked gas." *Id.* at p. 6-7.

Direct losses due to cut delivery nominations were calculated in essentially the same way, except Dr. Harris instead summed "the amount of gas illegally loaned and not yet repaid" and calculated the amount of *delivery* nominations cut by TCO. *Id.* at p. 7. "Again, the loss for a Plaintiff was not allowed to exceed the amount of illegally parked gas." *Id.* To determine resulting damages, each Plaintiff "multiplied the appropriate net margin by the amount of cuts." *Supplemental Report of Michael Harris, Ph.D.,* at p. 7. Plaintiffs allege TCO is liable to them for this amount.

Dr. Harris did not calculate indirect damages. Rather, each Plaintiff applied a "benchmarking framework" to carry out this task. *Id.* at p. 6. Dr. Harris described this framework as follows:

> [T]he net margins and business activity enjoyed by [the Plaintiff] when the illegal activity was not in place are compared to the net margins and business activity of [the Plaintiff] during the scheme. . . . As a means to estimate what the net margins and volume of business activity would have been absent the Defendants' conduct, the [Plaintiff] applies the net margins and business activity enjoyed outside of the period of the conduct to the period when the conduct took place.

*Id.* at p. 6. Dr. Harris further stated that "[t]his is a straightforward and accepted method for assessing damages." *Id.* The resulting figure represents an aggregate damage figure for which TCO is liable, according to Plaintiffs.

**B. Antitrust Claim**

-6-

Dr. Harris recognizes that "impact and damages for a specific Plaintiff must be assessed vis-a-vis the illegal activity of each of the five vertical conspiracies." *Report of Michael Harris, Ph.D.,* at p. 13. Like with the breach of contract claim, Dr. Harris "began with an analysis of the cuts incurred by a specific Plaintiff," but he then considered "the illegal activity attributable only to a specific vertical conspiracy," as opposed to "the cuts that resulted from the aggregate level of illegal activity." *Id.* Dr. Harris used the same framework to ascertain damages as under the breach of contract claim, except that, consistent with the Court's direction, he states that he evaluated cuts in the context of gas "illegally parked or loaned to a specific Defendant shipper" rather than as an aggregate amount. *Id.*

Again, to measure direct losses, each Plaintiff "multiplied the appropriate net margin by the amount of cuts to arrive at damage figures." *Supplemental Report of Michael Harris, Ph.D.,* at p. 7. Because the resulting figure was an aggregate amount, Dr. Harris provided Plaintiffs with "the allocation method needed to allocate damages to each of the specific Defendant shippers." *Id.*

To measure indirect losses, each Plaintiff used a benchmarking framework similar to the one described above. Dr. Harris vouched for Plaintiffs' methods: "[T]he use of benchmarking activity between periods of normal operations to those periods with anticompetitive conduct is a commonly accepted approach to estimating damages." *Id.* at p. 8. However, for the antitrust claim, the resulting figure also needed to be allocated among the Defendant shippers.

Plaintiffs also calculated their own loss of asset, or "scenario," damages. Dr. Harris stated that Plaintiffs used accepted methods to determine these damages.

**C. Harm to Competition**

Dr. Harris evaluated each of the five alleged vertical conspiracies through the same four-step analysis:

a) Determine on a daily basis whether the illegal conduct of the vertical conspiracy coincided with constrained market conditions.

b) If the illegal activity was conducted under constrained market conditions, calculate the marginal impact to the system.

c) Using accepted measures, convert the marginal impact to a structural measure of concentration that reflects market conditions but-for the illegal conduct.

d) Based on the structural measure assess whether the illegal conduct harmed competition.

*Report of Michael Harris, Ph.D.,* at p. 18.

In his report, Dr. Harris further elaborated on this analysis. Regarding the first step, Dr. Harris "determined whether gas had been illegally parked [by] or loaned to the Defendant shipper." *Id.* at p. 19. He then looked at whether the TCO system was "constrained" on days when the Shipper Defendants were permitted to illegally park or borrow gas. The term "constrained" means that the pipeline was operating "at or near one hundred percent utilization" on the day in question. *Id.* at p. 16. Dr. Harris assumed the TCO pipeline was "constrained if on any given day TCO cut the nominations of competitive shippers." *Id.* at p. 19.

"[N]atural gas markets under constrained conditions are susceptible to an exercise of market power." *Reply Report of Michael Harris, Ph.D.,* at p. 17. Dr. Harris says this premise holds true because, when a supplier's capacity exceeds the market's surplus of capacity above peak demand, that supplier is able to wield market power in a constrained market. (Dr. Harris refers to this concept as the "pivotal supplier analysis.") *Id.* at p. 22. Accordingly, if illegal parks and loans coincided with constrained market conditions, Dr. Harris calculated the "daily marginal impact" of the illegal activity. *Report of Michael Harris, Ph.D.,* at p. 19. This task was accomplished by adding up the

total amount of gas that TCO cut on a given day.  Dr. Harris also counted the number of shippers

that had gas cut on that day.

Dr. Harris next "converted the daily marginal impact to a measure of [market]

concentration."  *Id.* at p. 19.  This step is complicated and involves several steps of its own.  Dr.

Harris began by calculating the number of competitive shippers excluded from the market place by

the illegal parks and loans.  He also evaluated the Herfindahl-Hirshman Index (HHI) results for each

park and loan.  The HHI is a measure of market concentration.  To calculate it, one must count the

number of competitive firms excluded to determine the market share of each.  This value is then

squared and the result multiplied by the number of excluded competitive firms.  For example, if an

aggregate cut of 100,000 units of gas represented a cut of 4000 units for each of 25 competitive

shippers, each would have a market share of 4.0% and the HHI would be 400.  (Note that market

share apparently is not treated as a percentage under these calculations.)

Finally, the HHI must be evaluated to determine if the cuts caused a harm to competition.

The United States Department of Justice (DOJ) and Federal Trade Commission (FTC) promulgate

"Horizontal Merger Guidelines" to make such evaluations, at least in the context of a merger.  U.S.

DEPT. OF JUSTICE AND FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (Rev. 1997),

*available at* http://www.usdoj.gov/atr/public/guidelines/horiz_book/toc.html (last visited Feb. 20,

2009).  Three thresholds exist under the Guidelines.  *Id.* at § 1.51.  If a merger results in an HHI of

under 1000, the market remains "unconcentrated" and the merger is "unlikely to have adverse

competitive effects."  *Id.*  If a merger results in an HHI between 1000 and 1800 and the increase in

HHI is more than 100, the market is "moderately concentrated" and the merger "potentially raises

significant competitive concerns."  *Id.*  If the HHI post-merger exceeds 1800 and there is an increase

in HHI of over 100, then the market is "highly concentrated" and the merger is "presumed . . . likely to create or enhance market power or facilitate its exercise." *Id.*

Although these Guidelines were promulgated in the context of evaluating the effect of mergers on the competitiveness of markets, Dr. Harris asserts that they are applicable to this case because the Guidelines facilitate "an analysis of a market in two different states." *Report of Michael Harris, Ph.D.*, at p. 21.   According to Dr. Harris:

> In the present case, the analysis is between the TCO system when the illegal activity of the vertical conspiracy is taking place and one shipper is allowed to exclude others and of the TCO system assuming the illegal activity was not present and thus the one shipper was not allowed to exclude competitive shippers.

*Id.*  Dr. Harris asserts that comparison of the HHI for the market in both states permitted him to assess whether each alleged vertical conspiracy harmed competition within the market.

As further evidence of harm to competition, Dr. Harris points to a TCO employee's emails discussing the "Gaglio effect" and higher TCO prices.  Dr. Harris cites the emails as evidence of "what happens to prices when TCO's receipt points become constrained," in this instance because TCO had illegally parked gas on its pipeline.  *Id.* at p. 24, 26.  Dr. Harris also claims that the emails serve as "a simple affirmation of [his] earlier claims that TCO has absolute control over who enters the TCO system."  *Id.* at p. 24.

According to Dr. Harris, it is this absolute control, in conjunction with the lack of alternatives to shippers "to provide service to customers on [a given] system," that leads the Federal Energy Regulatory Commission (FERC) to regulate and publish cost-based tariffs on transportation services.  *Reply Report of Michael Harris, Ph.D.,* at p. 14.  Dr. Harris states that, "[a]s a matter of public policy, the FERC does not build duplicative pipeline system [sic] to serve the same customer.

Rather, they allow pipelines unique service areas where it is clear they will have market power and are thus regulated." *Id.* In theory, excluded shippers are free to "start up shop on another pipeline and find new customers" there. *Id.* at p. 22. However, this exclusion nonetheless reduces the number of competitors and thus harms competition.

**D. Unjust Enrichment**

TCO and Base apparently provided Dr. Harris with sufficient data to indicate an amount of alleged unjust enrichment. *Report of Michael Harris, Ph.D.*, at p. 25 & n.26. However, Dr. Harris asserts that CES did not provide sufficient data, and that he was forced to calculate CES's unjust enrichment. *Id.* at p. 25 n.26. He states that he completed this calculation by "first taking the difference between market price at the time of the park or loan and the market price at the time of the unpark or loan repay," and then subtracting the fee paid by CES to TCO and "an amount to reflect the cost to hedge either the park or loan transaction," which was derived from data provided by CES. *Id* at p. 25. Dr. Harris then added the penalties avoided by CES to assess its total unjust enrichment. *Id.*

Each Plaintiff also provided an allocation of the unjust enrichment damages owed to it. *Supplemental Report of Michael Harris, Ph.D.*, at p. 8-9. Dr. Harris stated that Plaintiffs employed similar methodologies in apportioning these damages. *Id.* at 10.

**E. Additional Areas of Harm**

**1. Distress Sales**

Dr. Harris states that the cuts calculated for the breach of contract and antitrust claims include gas disposed of in distress sales.  When a Plaintiff's nomination was cut, and storage was unavailable, it would be forced to sale the gas, often at a loss.  According to Dr. Harris, "In the case where the distress occurred as a result of the illegal activity and the Plaintiff incurred a loss on the sale, this is additional harm."  *Report of Michael Harris, Ph.D.,* at 29.

**2. Optimization of Gas in SIT Account**

For a fee, TCO provided a Storage in Transit (SIT) service "that allowed shippers to put their gas in SIT or take gas out of SIT on those days when they needed to."  *Id.*  Under the terms of this service, "shippers were required to 'cross-zero' twice in a thirty day [sic] period."  *Id.*  Obviously, a shipper would prefer to "cross-zero" when prices are either very high or very low, depending on whether they had a positive or negative imbalance.  Dr. Harris states that "[t]he illegal scheme thwarted shippers' attempts to optimize how they utilized the SIT account and thus harmed them." *Id.*

**IV.  LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of "[t]estimony by [e]xperts."  Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue,

-12-

> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

This rule codifies the holdings of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).

Application of Fed. R. Evid. 702 "entails a preliminary assessment of whether the reasoning

or methodology underlying the testimony is scientifically valid and of whether that reasoning or

methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  However,

the trial court has considerable discretion in fulfilling its "gatekeeping role." *Id.* at 597.  Still, the

*Daubert* opinion suggested several factors to aid the trial court in its decision.  These include:  1)

whether a theory or technique can be tested; 2) whether it has been subjected to peer review and

publication; 3) the known or potential error rate; and 4) whether the theory is generally accepted

within the relevant scientific community.  *Id.* at 592-594.  This list of factors "was meant to be

helpful, not definitive." *Kumho Tire Co.*, 526 U.S. at 151.  Nor do all factors necessarily apply in

every case. *Id.*  "It might not be surprising in a particular case, for example, that a claim made by

a scientific witness has never been the subject of peer review, for the particular application at issue

may never previously have interested any scientist." *Id.*

"The proponent of the testimony must establish its admissibility by a preponderance of

proof." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001).  "[P]roffered evidence

that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved

Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  "On the other hand, the court should be mindful that

-13-

Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Id.* Accordingly, there is no requirement "that the expert testimony a litigant seeks to offer into evidence [be] irrefutable or certainly correct." *Id.* In its gatekeeping capacity, a court merely determines admissibility. "As with all other admissible evidence, expert testimony is subject to being tested by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

## V.  DISCUSSION

Defendants' Motion to Exclude challenges Dr. Harris's testimony on five grounds. The Court discusses each of these grounds in turn.

### A. Causation

Defendants argue that "Dr. Harris' testimony should be excluded because he fails to take into account factors other than a Defendant's conduct that affected a Plaintiff's transportation nominations." *Defendants' Memorandum in Support*, at p. 4. Defendants observe that "Dr. Harris has himself admitted that nomination reductions are caused by factors other than a Defendant's park and loan transactions." *Id.* at p. 7. These "legitimate factors . . . rang[e] from competition not associated with park and loan transactions to weather conditions," to "changes in the pipeline's physical operating conditions such as the failure of pipeline facilities," to shippers' "creditworthiness, access to alternative transportation and storage services and local supply and demand factors." *Id.* at p. 5, 8. In Defendants' view, "Dr. Harris unreasonably assumes that all of

a Plaintiff's nomination reductions were caused by park and loan transactions when other factors caused nomination reductions." *Id.* at p. 7.

Plaintiffs have a simple, but satisfactory, response to this allegation: "all of these factors are necessarily taken into consideration because Dr. Harris takes the actual status of the system–in light of operational considerations, weather, etc.–as a *given* and then isolates the impact of the defendants' illegal PAL [park-and-loan] transactions to the nominations of plaintiffs." *Plaintiffs' Memorandum in Response*, at p. 10 (emphasis in original).  Defendants' concerns apparently stem from Dr. Harris's failure to create the promised regression model designed to distinguish between the impact of legitimate and illegitimate factors. *Defendant's Memorandum in Support,* at p. 5.  Dr. Harris indicated he would provide such a model during his class certification deposition, but as Plaintiffs explain, "[t]he issue then was whether one could in fact develop a class-wide damages model that would take into consideration legitimate, nonactionable factors that might affect different class members." *Plaintiffs' Memorandum in Response,* at p. 9.  The Court's denial of class certification obviated the need for such a model.  By evaluating Defendants' actual park and loan activity relative to Plaintiffs' actual nomination cuts, Dr. Harris's reports already consider factors like, for example, operational status.  Imagine that on a given day some problem with the pipeline reduces its storage capacity, and that also on that day a shipper has illegally parked gas on the pipeline.  If TCO denies a Plaintiff's request to store gas on the pipeline on that day, it is disingenuous to say that it did so due to the reduced storage capacity of the pipeline because, even considering the diminished capacity, the Plaintiff nonetheless could have stored its gas on the pipeline, but for the shipper's illegally stored gas, assuming the pipeline retained at least some operational capacity.  Thus Defendants' challenge to the proposed testimony should be rejected.

Defendants next challenge the notion that preferential services granted by TCO to CES and Base were behind Plaintiffs' nomination cuts.  Indeed, Defendants argue that Dr. Harris has failed to establish that they received preferential treatment at all, suggesting that TCO may have reduced their nominations on the same days that it reduced Plaintiffs' nominations.  *Defendant's Memorandum in Support,* at p. 5.  Thus Defendants describe Dr. Harris's methodology in the following way:

> Dr. Harris simply looks at whether [the Shipper Defendants] had an outstanding park or loan balance on a given day and whether TCO reduced any Plaintiff's nominations on that day.  If a Defendant had an outstanding park or loan balance on a day when a Plaintiff's nominations were reduced, Dr. Harris concluded that Defendant's park or loan caused that Plaintiff's nomination reduction.

*Id.* at p. 5-6.

As the Court understands the workings of the TCO pipeline, the very fact that some shippers were permitted to maintain a PAL imbalance while Plaintiffs had their nominations cut may indicate that these shippers received preferential treatment over Plaintiffs, because absent these shippers' "PAL gas congesting the system, these cuts would not have occurred."  *Plaintiffs' Memorandum in Response,* at p. 11.  Moreover, to the extent that Defendants challenge Plaintiffs' contention that the Shipper Defendants' gas effectively displaced Plaintiffs', the Court is satisfied with Plaintiffs' response:

> [D]efendants' argument repeatedly seeks to create the impression that in order to prove damage from a particular parking or lending transaction, Dr. Harris must somehow be able to identify and label a shipper defendant's molecule of gas and show it displaced a specific molecule of a plaintiff's gas.  For example, defendants' contention that Dr. Harris has not shown whether a particular cut may have been caused by another non-defendant shipper perpetrates the false assumption that one can trace a particular molecule of gas to a

-16-

> particular shipper.  As has been explained repeatedly in Dr. Harris's
> reports, this is an impossibility because gas molecules are fungible.

*Id.*  This explanation fulfills the requirements of Fed. R. Evid. 702, and the Court refuses to exclude Dr. Harris's testimony on this point.

Defendants also complain that Dr. Harris failed to "perform any analysis to establish a causal link between [Plaintiffs' indirect and scenario damages] and the Shipper Defendants' park and loan transactions."  *Defendant's Memorandum in Support,* at p. 6.  The Court believes that, while this challenge may affect the weight of Dr. Harris's damage testimony, it does not affect its admissibility. If Defendants are correct, their argument may bolster a later claim that Plaintiffs' failed to produce evidence for these damages, which the Plaintiffs calculated themselves.  However, it does not convince the Court to exclude any of Dr. Harris's testimony.

Continuing, Defendants point out that "Dr. Harris purports to show the instances when each Plaintiff's transportation nominations were reduced by TCO from January 1, 1995 through December 31, 2003.  However, none of the Shipper Defendants did any park and loan transactions in 1995, or after August 2003."  *Id.* at p. 7.  Defendants are therefore correct to observe that "the nomination reductions purportedly shown by Dr. Harris for 1995 and after August 2003 had, by definition, *nothing to do with any Defendant's park and loan transactions.*"  *Id.*  (emphasis in original).  In response, Plaintiffs represent that the reductions occurring when the Defendant Shippers were not engaged in park and loan activities are intended for consideration in conjunction with Plaintiffs' breach of contract claim against TCO only.  *Plaintiffs' Memorandum in Response,* at p. 12.  With this limitation in mind, the Court permits Dr. Harris to testify regarding these reductions.

Defendants also claim that Dr. Harris's reports ignore the effects of allegedly illegal park and loan transactions conducted by "select shippers" other than CES and Base, the two remaining Shipper Defendants. This argument, too, is apparently directed at testimony concerning the breach of contract claim against TCO. While it is true that Dr. Harris "evaluated cuts in the context of the total amount of gas illegally parked or loaned" in regards to the breach of contract claim against TCO, for the antitrust claim against all Defendants, he "focused only on the amount of gas that was illegally parked or loaned to a specific Defendant shipper." *Report of Michael Harris, Ph.D.*, at p. 13. Therefore, no Plaintiff can hold CES or Base liable for any nomination cuts that exceed the park and loan services provided to each of them on a given day. The Court does not understand Dr. Harris's reports to indicate anything inconsistent with this premise.

**B. Relevant Market**

Defendants argue that "Dr. Harris' antitrust testimony should be excluded due to his failure to conduct any economic analysis supporting his claim that the TCO system is a relevant market." *Defendant's Memorandum in Support,* at p. 12. According to Defendants, Dr. Harris's testimony is deficient primarily in two ways. First, they claim that "Dr. Harris conducted no analysis of what alternatives existed that would allow shippers on TCO to deliver their gas to end-user customers." *Id.* Plaintiffs respond that in fact Dr. Harris conducted such an analysis, but he found that no viable alternatives existed. *Plaintiffs' Memorandum in Response,* at p. 15. Dr. Harris stated that he "didn't see any instances where you could simply not use TCO, go to another pipeline and serve the same end user without using any of TCO's services." *Id.* (internal quotations omitted). Dr. Harris added that "[t]hat doesn't mean that a shipper might not be able to use alternative pipelines in a circuitous

route to access a customer," but he did not "necessarily view that as an economic alternative, though." *Id.* (internal quotations omitted). Plaintiffs argue that "[w]hile there could be some [other usable pipelines], they are not interchangeable." *Id.* (internal quotations omitted). In other words, "customers cannot take their business to other pipelines." *Id.*

The Court believes that Plaintiffs have carried their burden and that this testimony should be properly admitted. The Court sees no reason why the inquiry into the relevant antitrust market should stop at physical feasibility alone. Surely, some consideration of the element of economic practicality is also appropriate. Defendants apparently believe that the relevant antitrust market as defined by Dr. Harris is too broad. Of course, at trial they are free to demonstrate their point through "vigorous cross-examination [and] presentation of contrary evidence." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 596). However, the Court believes that Dr. Harris's testimony satisfies the requirements of Fed. R. Evid. 702 and that its exclusion would be improper.

Defendants' second attack on Dr. Harris's relevant market testimony is that he did not follow the Merger Guidelines,[2] used by the DOJ and FTC to evaluate whether a particular merger will result in harm to competition. Defendants argue that "Dr. Harris undertook none of the analytical steps typically taken in defining a relevant market under the Merger Guidelines" and that "he fails even to discuss (let alone follow) the Merger Guidelines' framework for defining a relevant antitrust market." *Defendant's Memorandum in Support,* at p. 13, 15. Plaintiffs respond that Defendants

_____

[2]Defendants have requested judicial notice of the Merger Guidelines and submitted a copy to the Court. U.S. DEPT. OF JUSTICE AND FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (Rev. 1997), §§ 1.0-1.22, *available at* http://www.usdoj.gov/atr/public/guidelines/horiz_book/toc.html (last visited Feb. 20, 2009). The Court notes that Plaintiffs have not opposed this request. The Court will view the submitted document as an authentic copy of the Guidelines. However, the Court does not believe it is necessary to grant the requested judicial notice at this time.

"attempt to use [the Guidelines] as a litmus test for admissibility" and that they "wrongly attempt[]
to convert these guidelines into a definitive and exclusive test for market analysis when in fact they
are simply guidelines that were developed in the context of merger analysis." *Plaintiffs'
Memorandum in Response,* at p. 17-18.

The Court believes that Defendants' concern is misplaced.  Although Dr. Harris's reports
reference the Merger Guidelines, they do not purport to follow them in their entirety.  The relevant
inquiry is whether Dr. Harris has defined the relevant antitrust market in a way that satisfies Fed.
R. Evid. 702, not whether he has dutifully followed the Merger Guidelines.  Dr. Harris states that
he borrowed the HHI thresholds of the Guidelines "because they provide guidance on how one
evaluates markets at different levels of concentration." *Plaintiffs' Memorandum in Response,* at p.
18.  He further states that "[t]he merger analysis of the DOJ is relevant to the present analysis
because it is essentially an analysis of a market in two different states," which Dr. Harris finds to
be analogous to the operation of the TCO system with and without illegal park and loan transactions.
*Report of Michael Harris, Ph.D.*, at p. 21.  Defendants have cited no authority that establishes the
Merger Guidelines as the only way to define a relevant antitrust market, particularly in a non-merger
context like this one.  Therefore, the Court believes that the relevant market may be defined, as Dr.
Harris has defined it, as "the wholesale and retail market for natural gas in the markets served by
the TCO pipeline system." *Id.* at p. 14.  Dr. Harris was not required to define the relevant market
precisely as the Merger Guidelines would have defined it.

## C. Pivotal Supplier Framework

Defendants argue that "Dr. Harris' antitrust testimony should be excluded due to his failure to conduct any economic analysis supporting his claim that the pivotal supplier framework properly applies to this case." *Defendant's Memorandum in Support,* at p. 17.  As Defendants observe, "each of the [Shipper] Defendants in fact possessed minimal market share on the TCO system."  *Id.* at p. 18.  From this fact, they conclude that "each [Shipper] Defendant's market share is so small it precludes a showing of market power."[3]  *Id.* at 20.  Dr. Harris himself acknowledges that "at first blush it is tempting to suggest that small firms cannot possibly possess market power given their share of the market is so little."  *Report of Michael Harris, Ph.D.,* at p. 17.

These observations speak to the importance of the pivotal supplier framework in this case. The pivotal supplier framework provides an explanation of how a firm with a minimal market share, operating in a constrained market, can nonetheless exert market power.  Dr. Harris explains the pivotal supplier framework in the following way:

> While the small firm's share may indeed be small when viewed relative to the entire market and all the firms, this assessment does not take into consideration the portion of the market being served under constrained conditions and the ability of other firms to compete with that firm.  If either all firms in the market are committed and/or other firms can't enter, it can easily be the case that the small firm can exercise market power over his output because he is, for all practical purposes, the only firm who can serve the marginal demand of consumers.  In unconstrained conditions, if the small firm attempts to increase his price, other firms simply undercut him.  In constrained

---

[3]Defendants have requested judicial notice of FERC's Order on Rehearing Modifying Interim Generation Market Power Analysis and Mitigation Policy, 107 FERC ¶ 61,018, 2004 WL 821548 (April 14, 2004), and submitted a copy to the Court.  The Court notes that Plaintiffs have not opposed this request.  The Court will view the  submitted document as an authentic copy of the Order.  However, the Court does not believe it is necessary to grant the requested judicial notice at this time.

> conditions, the small firm is the marginal firm or pivotal supplier and
> can very likely exercise market power.  In essence, the small [firm]
> is "at the margin" and setting the "marginal price."

*Id.* at p. 17-18.

To be admissible, Dr. Harris's use of the pivotal supplier framework must satisfy all three requirements of Fed. R. Evid. 702.  Defendants do not assert that, in general, the pivotal supplier framework is not "based upon sufficient facts or data" or that it is not "the product of reliable principles and methods."  FED. R. EVID. 702.  Rather, Defendants strongly oppose admission of this testimony on the ground that Dr. Harris has not "applied the principles and methods [of the pivotal supplier framework] reliably to the facts of the case."  *Id.*

To begin, Defendants argue that although FERC "has applied the pivotal supplier framework in analyzing market power on peak days in the electric industry[,] . . . Dr. Harris cites no authority applying the pivotal supplier framework to the natural gas industry."  *Defendant's Memorandum in Support,* at p. 19.  According to Defendants:

> The pivotal supplier framework is premised on specific
> characteristics of the electricity market.  Because electricity cannot
> be stored, the quantity supplied must equal the quantity demanded at
> all times.  As a result, at times of peak demand, the demand for
> electricity generation can become inelastic, enabling the supplier to
> exercise market power.

*Id.* at p. 20.  In Defendants' view, there is good reason that Dr. Harris has not offered any instance of the pivotal supplier framework being applied to a natural gas market: "it is in fact not the case."  *Id.* at p. 21.  Moreover, Defendants contend that Dr. Harris has "conducted no economic analysis demonstrating that it can be properly applied" to a natural gas market in this instance.  *Id.* at p. 19.

In response, Plaintiffs offer the following explanation of the use of the pivotal supplier framework to evaluate harm to competition in constrained natural gas markets:

-22-

> [W]hile FERC is not in the business of evaluating the anticompetitive impact of conspiracies between shippers and pipelines, and FERC market analysis is thus generally limited to market-based rate applications of natural gas pipelines to charge market based [sic] rates for primary firm [transactions] or to lift price caps on secondary firm transactions, nevertheless, evaluating market power at peak periods in natural gas pipelines is clearly accepted by FERC.

*Plaintiffs' Memorandum in Response,* at p. 21.  In support of the idea that FERC evaluates market power under constrained conditions in the context of natural gas markets, Plaintiffs cite a portion of the 2003 Natural Gas Market Assessment, authored by FERC's Office of Market Oversight and Investigations and referenced in Dr. Harris's report: "'Manipulation is more likely where market liquidity is low, price discovery is obscure and *capacity is constrained*, and this manipulation may move prices in either direction.'"  *Reply Report of Michael Harris, Ph.D.,* at p. 16 (quoting OFFICE OF MARKET OVERSIGHT AND INVESTIGATIONS, FED. ENERGY REGULATORY COMM'N, 2003 NATURAL GAS MARKET ASSESSMENT, 25 (2003), *available at* http://www.ferc.gov/legal/staff-reports/ngma-2003.pdf) (last visited Feb. 20, 2009) (emphasis added in report).  In Plaintiffs' view, "there is nothing magical or unique about pivotal supplier analysis;" "[it]. . . is nothing more than a test for market concentration during peak periods."  *Plaintiffs' Memorandum in Response,* at p. 22.  Because "Dr. Harris has established the relevant market on the TCO system during peak (constrained periods) [sic] and evaluated concentration in accordance with the HHI thresholds," he should be permitted to use the pivotal supplier framework in his testimony. *Id.*

The Court believes that Plaintiffs have carried their burden.  The Court sees no reason why the pivotal supplier framework can only be used in evaluating electricity markets or never used in evaluating natural gas markets.  It appears that "the reasoning [and] methodology underlying the

[pivotal supplier framework] is scientifically valid and . . . that [the] reasoning [and] methodology properly can be applied" to a constrained natural gas market. *Daubert*, 509 U.S. at 592-93. In a nutshell, Dr. Harris's report states that in a market operating at peak demand, and at or near capacity, a supplier is positioned to charge monopolistic rates or prices if its capacity is necessary for the market as a whole to meet (peak) demand, because buyers cannot otherwise fulfill their demand without the presence of this marginal supplier, provided that market capacity cannot be increased by new or existing suppliers and demand is inelastic. The Court does not intend to say that this testimony is "irrefutable or certainly correct" in the context of a natural gas market, but it is sufficiently reliable to pass muster under Fed. R. Evid. 702. *Westberry*, 178 F.3d at 261.

Defendants also claim that Dr. Harris "performed no analysis to determine whether the particular characteristics required for application of the pivotal supplier framework apply to the specific transactions and parties at issue." *Defendant's Memorandum in Support,* at p. 19. The reports' alleged deficiencies include Dr. Harris's failure to analyze "whether the gas parked by or loaned to a Defendant exceeded the difference between total uncommitted gas supply and peak demand for natural gas in the wholesale market" and "whether any of the Defendants, at the time of any of the reductions in the Plaintiff's nominations, was actually in a position to demand a high price above competitive levels and be assured of selling at least some of its capacity." *Id.* at p. 22. They also allege Dr. Harris failed to "offer[] any economic evidence showing that any Defendant withheld capacity on peak days." In sum, Defendants believe that Dr. Harris "has performed no analysis of his own showing [the pivotal supplier framework's] applicability . . . beyond Dr. Harris asserting that the pivotal supplier framework should apply to this case because he says so." *Id.*

As Plaintiffs point out in their response, "'[a] review of caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. . . . [T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Plaintiffs' Memorandum in Response,* at p. 7 (quoting 29 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 702 (2008)) (additional internal quotations omitted).   "[T]he traditional and appropriate means of attacking shaky but admissible evidence" remains "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 595.   Defendants' challenges to Dr. Harris's reports go beyond the requirements of Fed. R. Evid. 702.   Defendants seek to demonstrate deficiencies in Dr. Harris's application of the pivotal supplier framework, but the Court does not believe that any, or all, of these alleged deficiencies refute the Plaintiffs' showing that Dr. Harris has applied the framework reliably to the facts of this case.   Defendants may be correct in their criticisms of Dr. Harris's testimony, and they will have the opportunity to convince a jury that that is the case.   Nonetheless, this Court must be mindful that it sits only as a gatekeeper, and that Plaintiffs' burden is to convince the Court that its evidence is admissible, not that it is "irrefutable or certainly correct." *Westberry*, 178 F.3d at 261.   Here, Defendants' experts clearly disagree with specific applications of Dr. Harris's methodology.   "That disagreement, however, does not necessarily make [Dr. Harris's] analysis unreasonable, invalid or unreliable . . . ." *Coffman v. Metro. Life Ins. Co.,* 217 F.Supp.2d 715, 754 (S.D. W.Va. 2002).   Defendants' attacks on Dr. Harris's testimony do not rise to the level that would prevent the Court from admitting it.

In a related challenge, Defendants contest Dr. Harris's discussion of emails written by Bud Yeager, a TCO employee, discussing the "Gaglio effect."   In one email, Mr. Yeager writes, "The

Gaglio effect has reared its head over the past week with TCO prices above CNGs [sic] by about 3 to 6 cents.  This is due *mostly* the [sic] restrictions on TCOs [sic] receipt points."  *Report of Michael Harris, Ph.D.,* at 23 (emphasis added in report).  A subsequent email states:

> The Gaglio effect is **still** present. . . . This is due mostly to the fact that TCO receipt points are cranked down close to zero non-firm. . . .  **TCO is trading above New York again.** . . . *All things considered, it is cheaper to move gas on Transco to BGE, WGL, and north than transport TCO pool.*

*Id.* at 23-24 (bold emphasis in email; italicized emphasis in report).  In a third email, Mr. Yeager included a graph of daily prices on the TCO pipeline and another pipeline with the caption:  "The Gaglio Affect [sic] Game . . . Guess when TCO was restricting Pipeline receipt points."  *Id.* at Ex. 2.  Defendants argue that these emails "contain[] no information suggesting supply was reduced and prices increased *as a result of any Defendant's park and loan transactions,* let alone that any Defendant at any time was a 'pivotal supplier.'"  *Defendant's Memorandum in Support,* at p. 23 (emphasis in original).  Defendants also oppose any reference by Dr. Harris to Mr. Yeager's "pricing analysis" because, they claim, "Dr. Harris performs no analysis to validate Mr. Yeager's so-called 'pricing analysis;' to connect what it purports to show with any Defendant's park and loan transactions; or to demonstrate why it supports application of the pivotal supplier framework to this case."  *Id.* (quoting *Report of Michael Harris, Ph.D.,* at p. 24).

Plaintiffs counter that:

> From his position at the price desk, Mr. Yeager was the TCO employee who was in the best position to make observations about the functioning and effects of its system constraints. . . . [T]he Yeager emails are a powerful acknowledgment that prices on the TCO system rise when TCO is restricting access–and the illegal PAL activity indisputably restricted access.

*Plaintiffs' Memorandum in Response,* at p. 23.

-26-

Insofar as Defendants contend that there is no link between the illegal park and loan transactions on the one hand, and decreased supply and thus increased price on the other, their contention does not overcome Plaintiffs' showing of the reliability of Dr. Harris's testimony on this point. Indeed, Dr. Harris's testimony directly addresses this supposed void: "TCO's receipt point[s] became constrained precisely because of the illegal activity." *Report of Michael Harris, Ph.D.*, at 23. This statement also refutes Defendants' next challenge, that Dr. Harris failed to validate Mr. Yeager's price analysis. Mr. Yeager's price analysis seems to be no more complicated than simple supply and demand. TCO allegedly restricted access to receipt points, cutting supply and causing prices to rise. It would be inappropriate for the Court to take sides in such a "battle of the experts." Finally, Defendants claim that Dr. Harris fails "to demonstrate why [the Gaglio effect] supports application of the pivotal supplier framework to this case." *Defendant's Memorandum in Support,* at p. 23. This claim may have merit, but it fails to rebut the Plaintiffs' showing that the Gaglio effect and the pivotal supplier framework are reliable. Such consideration is better reserved to the jury than the Court.

**D. Damages**

Defendants argue that "Dr. Harris' testimony regarding damages should be excluded as it lacks any valid economic basis." *Id.* Many of Defendants' specific complaints already have been addressed in the section of this opinion dealing with Defendants' attacks on Dr. Harris's causation

testimony.[4]  Therefore, this section only deals with those challenges that have not been resolved by the Court's discussion of Dr. Harris's causation testimony.

First, Defendants seem to suggest that something is amiss with Plaintiffs' role in calculating their damages.  For direct damages, Plaintiffs calculated an aggregate amount and "Dr. Harris then provided a method for allocating these damages among the Defendants."  *Id.* at p. 24.  Plaintiffs calculated their own indirect and scenario damages.  Dr. Harris testified that Plaintiffs employed accepted methodologies in doing so.  The Court finds nothing in these actions to merit exclusion.

Second, Defendants claim that:

> Dr. Harris provides no explanation or economic justification why damages are allocated equally among Defendants if the volume of nominations reduced by TCO is less than the outstanding parks and loans, while damages are apportioned proportionally among Defendants if the volume of nominations reduced by TCO is greater than outstanding parks and loans.  This distinction is entirely arbitrary.

*Id.* at p. 27.

On the contrary, the Court believes Dr. Harris's methodology meets the reliability requirements of Fed. R. Evid. 702.  When the volume of alleged illegal parks and loans individually permitted CES and Base on a given day exceeded the volume of a Plaintiff's nomination cuts for that day, it is impossible to determine which Defendant's parks and loans caused Plaintiff's nomination cuts.  That is, looking at CES and Base in isolation, each alone received sufficient park and loan services to be the cause of Plaintiff's nomination cuts.  Thus apportioning damages equally between

---

[4]Specifically, that section included discussion of Dr. Harris's supposed failure to control for factors other than Defendants' alleged illegal park and loan transactions, including the alleged illegal activities of non-defendant select shippers, and Dr. Harris's supposed attribution to CES and Base of damages that occurred when they were not receiving park and loan services from TCO.

-28-

the two is a reliable method of calculating each's liability.  Of course, CES and Base will be free to argue at trial that there is a more appropriate method, such as allocating damages in proportion to the amount of park and loan services each received.  As this Court has stated elsewhere in this opinion, "disagreement, however, does not necessarily make one side's analysis unreasonable, invalid or unreliable . . . ."  *Coffman,* 217 F.Supp.2d at 754.

Similar logic applies to Defendants' contention that apportioning damages "proportionally among Defendants if the volume of nominations reduced by TCO is greater than outstanding parks and loans . . . . is entirely arbitrary."  *Defendant's Memorandum in Support,* at p. 27.  When a Plaintiff's nomination cuts exceed CES and Base's parks and loans on a given day, damages are capped at their cumulative parks and loans.  Obviously, CES and Base cannot be liable for nomination cuts in excess of their parks and loans, because the excess cuts clearly were not a product of them.  Moreover, unlike when parks and loans exceed nomination cuts, the volume of Plaintiff's cuts attributable to each Defendant is clear.  Dr. Harris's method of apportioning damages is not "arbitrary" as Defendants claim.

Defendants' final unresolved claim in regards to damages is that "Dr. Harris' damages model fails to account for Plaintiffs' efforts to mitigate the damages they allegedly suffered as a result of TCO reducing their transportation nominations."  *Id.*  Defendants' experts contend that "[p]resenting a finding that implies that cut volumes are inexorably lost ignores the fact that when a shipper's nomination is cut, the shipper has the ability to move the gas elsewhere or attempt to transport the gas on a subsequent (e.g., following) day."  *Expert Report of Jospeh P. Kalt, Ph.D.,* at p. 40.  As evidence that Plaintiffs in fact utilized alternative means, Defendants point to the deposition of a representative of Plaintiff Energy Marketing Services (EMS), in which the representative appears

-29-

to  indicate that EMS found other delivery options to deliver gas to customers when it had its nominations cut by TCO.  *Deposition of Albin A. Strohen*, at p. 78.  However, the representative also indicated that the replacement delivery method generally entailed increased costs to EMS, which it absorbed.  *Id.*  Furthermore, Defendants point to no evidence that other Plaintiffs found alternative delivery methods.

Plaintiffs fail to defend against Defendants' claim in their response.  Indeed, Defendants' criticism may have merit, and Plaintiffs may have no response to it.  But the Court does not believe that this motion is the appropriate context to resolve this matter.  Defendants' challenge affects the weight of Dr. Harris's testimony, not its admissibility.  If a jury credits the testimony of Defendants' experts over Dr. Harris's testimony, it may reduce Plaintiffs' damages accordingly.  However, the Court will not usurp that role and force Dr. Harris to conform his testimony to that of Defendants' experts.  Furthermore, Defendants bear the burden of proving a failure to mitigate damages.  They have not carried this burden.

**E. Unjust Enrichment**

Defendants argue that "Dr. Harris' unjust enrichment testimony should be excluded because he has failed to show which Defendant was enriched at the expense of which Plaintiff."  *Defendant's Memorandum in Support,* at p. 28.  This argument echoes Defendants' earlier argument that "Dr. Harris' assumption that a particular Defendant necessarily caused a particular Plaintiff's transportation nomination reduction if the Defendant had a park or loan at the same time as the Plaintiff's reduction is fundamentally flawed."  *Id.* at p. 29.  Previously, Defendants argued that a showing that a Defendant received parks or loans on the same day that a Plaintiff had its

-30-

nominations cut is insufficient to demonstrate that the Defendant's parks or loans caused the Plaintiff's damages. Here, Defendants essentially argue the corollary to that idea, that a showing that a Defendant received a park and/or loan on the same day that a Plaintiff had its nominations cut is insufficient to demonstrate that the Defendant was unjustly enriched at the expense of the Plaintiff.

Dr. Harris described his methodology in paragraphs 50 to 52 of his September 2, 2008 report and throughout his September 29, 2008 supplemental report. He calculated the increased market prices realized by Defendants, individually as to the Select Shippers, from the illegal scheme. He also added the value of avoiding certain fees and penalties that would have been imposed on Defendants but for the scheme. In his supplemental report he reviewed individualized data for Plaintiffs and applied an allocation model to divide Defendants' unlawful gains among Plaintiffs.

Again, Plaintiff's response convinces the Court that this testimony is sufficiently reliable: "[D]efendants' theory of what plaintiffs must prove in order to recover would again seek to burden plaintiffs with the impossible task of proving that a plaintiff's particular molecules of gas ended up in the possession of a particular defendant who was thereby unjustly enriched." *Plaintiffs' Memorandum in Response,* at p. 27. As explained above, gas molecules are fungible, and it is not possible to show, for example, that a Defendant was unjustly enriched when its gas "bumped" a Plaintiff's gas off of the TCO system. Dr. Harris's testimony is that Defendants were unjustly enriched when they received preferential park and loan services because TCO was forced to cut Plaintiffs' nominations in order to provide Defendants with these illegal services. Plaintiffs' pain was Defendants' gain. This testimony meets the requirements of Fed. R. Evid. 702, and the jury should be permitted to hear it.

-31-

## VI.  CONCLUSION

For the foregoing reasons, Court **DENIES** Defendants' Motions to Exclude Testimony of Dr. Harris (2:04-cv-869, doc.158; 2:04-cv-870, doc. 158; 2:04-cv-871, doc. 160; 2:04-cv-872, doc. 159).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.


ENTER: March 17, 2009


ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE